```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Dave A. Starcher,                :

         Plaintiff,              :

     v.                          :        Case No.  2:15-cv-3113

                                 :        JUDGE JAMES L. GRAHAM
Commissioner of Social Security,          Magistrate Judge Kemp

         Defendant.              :
```

                      REPORT AND RECOMMENDATION

                         I.   Introduction

   Plaintiff, Dave A. Starcher, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits.  That application was filed on May 7, 2012, and alleged that Plaintiff became disabled on November 1, 2008.

    After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on February 6, 2014.  In a decision dated June 13, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on October 27, 2015, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on March 21, 2016.  Plaintiff filed a statement of specific errors on May 26, 2016, to which the Commissioner responded on June 23, 2016.  Plaintiff has not filed a reply brief, and the case is now ready to decide.

     II.   Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 53 years old as of the date of the hearing and who completed one year of college, testified as follows.  His testimony appears at pages 48-73 of the administrative record.

Plaintiff first testified that he could not work because he could not sit for very long. He could do a little walking but had pain in his ankles and feet. Also, he had limited use of his hands and had pain in them all the time. He could also stand for no more than ten or fifteen minutes.

2008 was the last year in which Plaintiff had worked. He left that job because he was laid off. The same thing happened with his previous job. Even when he was working, he had significant health problems. Those two jobs were both in debt collection, and he had also been a store manager and a customer service representative.

Upon further questioning about his physical abilities, Plaintiff said he could sit between twenty minutes and half an hour and then resume sitting if he could stand up and move around for five minutes or so. He was limited to lifting five pounds due to a hernia. Plaintiff saw a doctor only every three months because he had no insurance. He was most comfortable lying on his side. If he used his hands for more than a minute or two, they would cramp up.

In a typical day, Plaintiff would eat breakfast, feed his pets, get dressed, sit on the couch, and visit with his sister. He would also get up and move around in between sitting. He could cook simple meals and load a dishwasher. He had attempted to shovel snow the day before the hearing but that caused him to have back pain. Pain interrupted his sleep at night. Plaintiff did some reading and was able to use the internet to check email or Facebook. He could dress himself but shaving was difficult. Finally, he testified that if he took Flexeril as prescribed (every six hours) he could not function.

### III.  The Medical Records

The pertinent medical records are found beginning at page 235 of the record and can be summarized as follows.

Taking the exhibits in order, the first set of records come from Dr. Swarup, who treated Plaintiff for fibromyalgia. That diagnosis appears in a 2009 treatment note which indicates that 18 out of 18 tenderpoints were present. Additionally, tenderness of the hands was noted. The plan at that point was to restart Plaintiff on Lyrica and have him exercise and stop smoking. Plaintiff said the Lyrica helped but he was only able to get it for a month, and he was experiencing pain in his neck, back, elbows, shoulders, knees, and ankles. He also had morning stiffness and swelling, from arthritis, in his elbows and fingers. When Plaintiff saw Dr. Swarup again in June, 2010, he was still having joint swelling from rheumatoid arthritis and overall body ache from fibromyalgia. He had also developed episodic back pain over the past four months, located in the lumbar area. No fibromyalgia tenderpoints were present at that time. He was prescribed Flexeril and Vicodin. Notes from 2011 and 2012 were similar; 11 fibromyalgia tenderpoints were noted during two of those visits, and Plaintiff reported generalized musculoskeletal pain, including an increase in shoulder pain radiating to his fingers. (Tr. 236-53).

Plaintiff saw Dr. Whitehead for a consultative physical examination on October 15, 2012. His chief complaint was described as "polyarthralgias." Plaintiff reported daily constant pain exacerbated by lifting and bending. He also had problems grasping objects, particularly with his left hand, and complained of diffuse weakness and periodic numbness in his right hand. He said he could sit for thirty minutes, stand for an hour, and walk about half a mile. He also did light cooking, cleaning, and shopping. On examination, Plaintiff walked with a stable gait. He showed decreased range of motion in the cervical spine, with tenderness, and painful motion in the lumbar spine. Straight leg raises were negative. There was mild tenderness in

the hands and decreased grip strength on the left. Trigger point testing showed only two points present.  Dr. Whitehead diagnosed rheumatoid arthritis, fibromyalgia, and coronary artery disease.  He concluded that Plaintiff "would be best suited for sedentary type job duties with intermittent standing throughout the day and would likely be able to tolerate intermittent standing for 4-5 hours throughout the day, only occasional bending and lifting with a 10 pound lifting restriction."  (Tr. 255-57).

Plaintiff had been living in Arizona, which is where he was seen by Dr. Swarup.  When he moved back to Ohio, he began treatment with Dr. Madan.  Dr. Madan's notes show that Plaintiff was assessed with rheumatoid arthritis.  X-rays of Plaintiff's hands were taken on February 28, 2013 which showed cyst formation in both wrists and deformities which might be related to avascular necrosis.  An x-ray of Plaintiff's feet showed joint narrowing and degenerative changes as well as osteophyte formation, and an x-ray of the cervical spine showed degenerative changes as well.  (Tr. 262-80).  An office visit note from April 1, 2013, shows that Plaintiff was reporting 1-2 hours of morning stiffness and pain at a six out of ten level as well as pain and swelling in the feet, hands, ankles, and knees.  Examination showed decreased range of motion in the cervical spine and the lumbar spine and diffuse swelling in the hands and fingers, with all joints tender to palpation.  Plaintiff's knees were also swollen and warm to the touch.  His gait was antalgic.  He was assessed with rheumatoid arthritis, chronic pain syndrome, osteoarthritis, vitamin D deficiency, and fibromyalgia.  Referral to a pain specialist was recommended once Plaintiff obtained insurance.  (Tr. 282-85).

The final medical record is an office note from Dr. Patel dated October 23, 2013.  It notes, among other things, that fibromyalgia was diagnosed in February, 2013 through laboratory

testing.  There is no indication that any physical examination was performed that day.  (Tr. 291).

In addition to these treatment or evaluation records, two state agency physicians expressed views about Plaintiff's physical capabilities.  Dr. Lewis noted diagnoses of inflammatory arthritis, fibromyalgia, and ischemic heart disease.  He concluded, on October 24, 2012, that Plaintiff could do light work and had some limits on his ability to climb ladders, ropes, and scaffolds, stoop, and bend at the knees.  Additionally, handling and fingering were limited to frequent, apparently based on comments that Plaintiff was not currently having difficulties with fine and gross manipulation.  (Tr. 94-98).  Dr. Bolz reached the same conclusions in his report of January 1, 2013.  (Tr. 107-09).  Neither had the benefits of the reports from Drs. Madan and Patel.

### IV.   The Vocational Testimony

Mark A. Anderson was called to testify as a vocational expert at the administrative hearing.  His testimony begins at page 75 of the administrative record.

Mr. Anderson first testified about Plaintiff's past relevant work.  He said the collection clerk job was skilled and sedentary, and the store manager job was skilled and light.  The other job, which Mr. Anderson described as check cashier, was sedentary and semi-skilled.

Next, Mr. Anderson was asked some questions about someone with Plaintiff's background and who could work at the sedentary level, could climb ramps or stairs occasionally but not ladders, ropes, or scaffolds, could occasionally balance, kneel, stoop, crouch, and crawl, and could do handling and fingering only frequently.  The person also needed to be able to alternate between sitting and standing, being able to sit for an hour before needing to get up and stretch for five minutes.  Mr.

Anderson said that someone with those restrictions could do Plaintiff's past job as a collection clerk or check cashier.

Next, Mr. Anderson was asked how limiting the person's ability to handle and finger to occasionally would affect the ability to do those jobs.  He said that restriction would eliminate both jobs and leave only a sedentary job of credit information clerk which such a person could do.  Additionally, if the person were off task for five minutes at a time every thirty minutes so that he or she could stand up and walk around, as a practical matter that person could not be gainfully employed.  The same would be true if the person missed two days or more of work per month or had many marked mental limitations relating to work functions.  Further, he testified that if a person could do handling on a frequent basis but fingering on only an occasional basis, none of Plaintiff's past work would be available.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 26-35 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the special earnings requirements of the Social Security Act through December 31, 2013.  Second, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including inflammatory arthritis, osteoarthritis, and coronary artery disease.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional

capacity to perform work at the sedentary exertional level although he could not climb ladders, ropes, or scaffolds, and he could only occasionally crawl, balance, stoop, kneel, and crouch and climb stairs and ramps.  Further, Plaintiff was required to shift positions between sitting and standing, being able to sit for one hour at a time before standing and stretching for five minutes, and he was limited to frequent fine and gross manipulation (or handling and fingering).

With these restrictions, the ALJ concluded that Plaintiff could perform his past relevant work as a collection clerk and check cashier.  Such a finding is inconsistent with disability.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

### VI.  Plaintiff's Statement of Specific Errors

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

   Plaintiff is proceeding in this case *pro se* and has not filed a traditional statement of errors.  He has attached to his filing a number of more recent medical reports which were not before the ALJ and which this Court therefore cannot consider in determining if the ALJ's decision is supported by substantial evidence.  See, e.g., Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993), holding that "the district court improperly considered [the claimant's] new evidence because the claimant failed to demonstrate good cause justifying a remand for administrative consideration of the new evidence."  The Court can review Plaintiff's new evidence to see if it would justify a remand under 42 U.S.C. §405(g), sentence six, but must evaluate the ALJ's decision on the basis of the records before that judge.

   As to that issue, the key decisions made by the ALJ - decisions which, had they gone the other way, would have resulted in a finding of disability - were that Plaintiff could perform handling and fingering frequently rather than occasionally, and that he could sit for up to an hour at a time during the work day before needing to change positions.  If Plaintiff's testimony on either of these points had been accepted, the decision could well have been different.  Since Plaintiff indicates a general disagreement with the ALJ's decision concerning his ability to function in the workplace, the Court will review these findings under the substantial evidence standard.

   The ALJ first acknowledged Plaintiff's testimony at the hearing that he had difficulty sitting and that due to weakness

in his hands he had trouble holding a pen or pencil.  However, the ALJ found those statements not to be fully credible.  (Tr. 31).

Next, the ALJ concluded that Plaintiff's primary impairment was rheumatoid arthritis.  The ALJ found that Plaintiff's fibromyalgia was not a medically determined impairment because other explanations for his symptoms - specifically, rheumatoid arthritis - had not been excluded and that, under the applicable Social Security Ruling, SSR 12-2p, such exclusion is required, see Tr. 29.  The ALJ then determined that any comments about the level of Plaintiff's pain made to Dr. Swarup in 2009 were inconsistent with that physician's observation that Plaintiff was "in no acute distress," and further noted that he visits to Dr. Swarup produced only unremarkable findings.

The ALJ then discussed Dr. Whitehead's opinion, noting Plaintiff's report of difficulty grasping with his left hand and an inability to sit for more than 30 minutes - the same amount to which he testified at the administrative hearing.  After noting that testing of the hands showed only some diminished strength in the left hand, the ALJ gave "great weight" to Dr. Whitehead's conclusions.  (Tr. 32).

Turning to the 2013 medical records, the ALJ acknowledged that the x-rays taken at that time showed various findings, but said that the physical examination s "remained largely unremarkable."  He characterized Dr. Madan's comment that Plaintiff's general appearance was within normal limits as being incompatible with a finding of disabling symptoms notwithstanding the positive signs exhibited on examination.  (Tr. 32).

In what appears to be his credibility finding, the ALJ noted that at the hearing, "claimant is able to dress himself, prepare meals, clean the house, and shovel snow for 10 to 15 minutes at a time." (Tr. 32).  This meant that "claimant is able to grasp, stand, walk and manipulate on some level" and led the ALJ to

conclude that he could do frequent handling and fingering.  Id. The ALJ also noted that in an effort to accommodate Plaintiff's chronic pain symptoms, he found that Plaintiff needed to shift positions "to the extent described in this decision" - that is, after an hour of continuous sitting.  Id.  Finally, the ALJ, giving "some weight" to the opinions of the state agency reviewers, said that due to the combined effects of Plaintiff's impairments, including obesity, he had decided to limit Plaintiff to sedentary rather than light activity.  (Tr. 33).

    Addressing first the ALJ's finding that Plaintiff's fibromyalgia is not a medically determinable impairment, the Court notes that SSR 12-2p was adopted to provide "guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM in disability claims...."  After describing fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months," the Ruling states that fibromyalgia is a medically determinable impairment "when it is established by appropriate medical evidence" and "can be the basis for a finding of disability."  It then notes that fibromyalgia can only be established by evidence from an acceptable medical source, and that there must be both a diagnosis and evidence described in the following two subsections of the Ruling.  The first, section II(A), requires a history of widespread pain, at least eleven positive tender points on examination, and evidence that other disorders which could cause the symptoms or signs were excluded.  The second set of criteria found in section II(B) are similar except that "[r]epeated manifestations of six or more FM symptoms" is substituted for the tender point findings.  The ruling also advises adjudicators that if objective evidence does not substantiate the claimant's symptoms, the adjudicator still must consider "all of the

evidence in the case record" - an acknowledgment that, often, objective testing is insufficient to determine the extent to which fibromyalgia may be debilitating.

The record in this case contains multiple diagnoses of fibromyalgia, and that was one of the conditions listed and evaluated during the first two levels of the administrative review process.  There were also at least two instances where the tender point criteria were satisfied.  The ALJ did not specifically base his decision about fibromyalgia on the fact that, at other times, Plaintiff did not demonstrate the required number of tender points, and there is nothing in this record to explain whether, in order to reach a valid diagnosis of fibromyalgia, a physician must be able to locate at least eleven tender points at each examination.  That leaves, as the crucial part of the ALJ's finding on the issue, his determination that because Plaintiff suffered from rheumatoid arthritis, he could not also be suffering from fibromyalgia.

That finding seems totally at odds with the decisional law in this area.  For example, in Stup v. UNUM Life Ins. Co. of America, 390 F.3d 301, 303 (4th Cir. 2004), the court quoted an HHS/National Institute of Health study which said that "People with rheumatoid arthritis and other autoimmune diseases, such as lupus, are particularly likely to develop fibromyalgia."  One of the leading opinions dealing with fibromyalgia from the Sixth Circuit Court of Appeals, Rogers v. Comm'r of Social Security, 486 F.3d 234 (6th Cir. 2007), involved a claimant who had been diagnosed with both rheumatoid arthritis and fibromyalgia, and the court remanded the case for further consideration of both impairments.

As the Court reads SSR 12-2p, if the medical records do not demonstrate that any testing was done to identify and rule out other conditions which might also cause the type of overall muscle, joint, or soft tissue pain associated with fibromyalgia,

an ALJ might well find that the third diagnostic criterion set forth in SSR 12-2p were not met. However, when, as here, such testing is done, and another condition (rheumatoid arthritis) is identified, but that condition causes different types of symptoms such as joint swelling, which is not typically associated with fibromyalgia, see, e.g., Preston v. Sec'y of HHS, 854 F.2d 815, 818 (6th Cir. 1988)(examination of a fibromyalgia patient ordinarily shows "a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions"), it is simply incorrect to conclude that both illnesses cannot co-exist. The physicians who diagnosed both, and treated both separately, clearly determined that rheumatoid arthritis was both present and did not fully explain Plaintiff's other symptoms; otherwise, they would not have diagnosed both conditions. In this situation, it was legal error for the ALJ to find that because rheumatoid arthritis had been diagnosed, Plaintiff's fibromyalgia could not qualify as a medically determinable impairment.

   The Commissioner, apparently recognizing that the ALJ's decision on this issue might be problematic, argues that any error made by the ALJ was harmless. There is a body of case law holding that when an ALJ erroneously decides that a medical condition is not severe, if the limitations caused by that condition are considered when the ALJ decides what the claimant can and cannot do, it makes no difference whether that condition was found to be "severe" at the second step of the analysis. See, e.g., Taylor v. Astrue, 2012 WL 870770, *5 (S.D. Ohio March 14, 2012), adopted and affirmed, 2012 WL 1268178 (S.D. Ohio April 13, 2012), citing Maziarz v. Sec'y of HHS, 837 F.2d 240, 244 (6th Cir. 1987). That is not what occurred here, however. As explained below, the ALJ's determination that Plaintiff's fibromyalgia was not a medically determinable impairment appears to have influenced his analysis of Plaintiff's limitations and

his assessment of Plaintiff's credibility, thereby influencing his residual functional capacity finding as well.

As SSR 12-2p indicates, and as the case law has established, a fibromyalgia sufferer can present to a physician without any significant objective signs or symptoms. As noted in Preston, supra, and repeated in numerous other decisions, the typical signs of orthopedic or neurologic abnormalities are often absent in fibromyalgia patients. See also Sarchet v. Chater, 78 f.3d 305, 307 (7th Cir. 1996)(noting that the ALJ had improperly "depreciated the gravity of [claimant]'s fibromyalgia because of the lack of any evidence of objectively discernible symptoms, such as a swelling of the joints"). But here, the ALJ's decision is replete with comments that because various treatment notes describe Plaintiff as "in no acute distress" or as having a general appearance "within normal limits," he could not be experiencing debilitating pain or weakness, particularly from fibromyalgia. That type of analysis is problematic under the best of circumstances because the key findings in a doctor's report are the examination results rather than more general comments about the patient's appearance. But this analysis is especially troubling in a case involving fibromyalgia, where such comments are completely consistent with the way in which persons with that disease can appear when examined. The ALJ may well have been influenced to make these comments - and to devalue Plaintiff's testimony as well as some of the objective findings from his physicians - because of his erroneous decision about whether Plaintiff's fibromyalgia was a medically determinable impairment. The error is therefore not harmless, or, at least, the Commissioner has not carried the burden of showing that it was, and a remand is required in order for the ALJ properly to evaluate the case in light of the diagnosis of fibromyalgia and its presence as a severe impairment.

On remand, the ALJ should also consider some additional

factors.  The state agency opinions are the only place in the record where Plaintiff is said to be capable of frequent fingering and handling (although that conclusion may also be implied by Dr. Whitehead's report).  But all of those opinions predate the x-ray findings from Dr. Madan.  Those findings, which a lay person is probably unable to interpret, coupled with Plaintiff's testimony that his hand weakness has worsened, suggest that additional evidence should be taken on the question of whether he retained the ability to handle and finger frequently at all times before the expiration of his insured status.  Also, Dr. Whitehead's report, to which the ALJ assigned great weight, expressed no opinion as to how long Plaintiff could sit continuously before needing to stand.  Dr. Whitehead limited Plaintiff to a sedentary level of lifting and said he could tolerate four to five hours of standing, but the only evidence in the record as to how long Plaintiff could sit before needing to change positions is Plaintiff's own testimony.  Nothing in his testimony, which the ALJ summarized in a way that does not accurately reflect what Plaintiff said about his ability to cook, clean, dress, shop, or shovel snow, is inconsistent with a half-hour sitting limitation.  Consequently, the ALJ should make a specific credibility finding about that portion of Plaintiff's testimony, and if he finds it not to be credible, should explain why not, following the analytical pattern described in cases like <u>Felisky v. Bowen</u>, 35 F.3d 1027 (6th Cir. 1994).  Also, Plaintiff testified that, as of the time of the hearing, although he could dress himself, he could no longer wear clothing with buttons or zippers.  His testimony about being able to dress himself is not, as the ALJ seemed to conclude, inconsistent with an inability to finger or handle more than occasionally, and a more detailed credibility finding should be made on this issue as well.  In short, especially given the key nature of the questions of how long Plaintiff could sit and how frequently he could handle and

finger, all of these issues deserve a more through discussion than the ALJ devoted to them.

As noted above, Plaintiff also included some more recent medical records with his statement of errors.  On remand, he may submit them to the ALJ, although the ALJ will be free to determine if they have any relevance to Plaintiff's functional capacity on or before December 31, 2013.  To make it clear, the remand which is being recommended is not based on this evidence but on the errors identified in the ALJ's decision.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v.

-15-

<u>Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                         <u>/s/ Terence P. Kemp</u>
                                         United States Magistrate Judge